Good morning, Your Honor. Mark Weaver on behalf of the petitioner Gohar Melkonyan. I'd like to reserve three minutes of time for rebuttal. What do we have on the clock? What have you done? Very good, Your Honor. Your Honors, this case is not just about one woman who participated in women's activities in Armenia and who was persecuted for her participation. This is also about retaining meaningful judicial review of immigration judges. The government posits that demeanor findings in their entirety are unreviewable and that adverse credibility determinations in general can be upheld as long as no reasonable fact finder could come to the conclusion that the immigration judge came to, regardless of the factors that were cited on the record. And just to make things clear from the outset, this is simply not the precedent established by this circuit. And the immigration judge himself was harboring no illusions as to what the law was when he recited his own standard of review at the administrative record on page 50 when he correctly said that adverse credibility determinations must be based on specific cogent reasons which are substantial and bear a legitimate nexus to the finding. And he went on to say that my... It's enough in the case law if you have one, right? You don't have to have... If I.J. could be wrong on everything, if there's one that's valid, then we must uphold it. That's correct, Your Honor. If there is one that goes to the heart of the claim that is not otherwise tainted by other problems, but if... May I ask about that? I am troubled by the I.J.'s determinations about demeanor, saying, you know, she wasn't emotional, she was kind of stone-faced and that sort of thing. Because those smack of a kind of demeanor findings we see that have been found to be inappropriate for victims of sexual abuse. Let's say that that kind of a blanket finding is inappropriate. However, there are other findings such as, I spoke in front of thousands, I didn't speak in front of anyone. How do you... What then is the status on appeal where you have that kind of a collision between a general demeanor and a specific credibility issue? You make a good point, Your Honor. The decision is not altogether clear that the demeanor finding did not color the remainder of the findings presented in this case. The judge, if we are to throw out the demeanor finding, I think it would be reasonable to remand or to reverse altogether and send it back to the judge to determine whether this clouded his decision-making with respect to the other inconsistencies. Because, as he says, in his decision that it wasn't just one of these factors which was problematic, it was the entire thing which he believed was a memorized speech. But, at the same time, he prefaced this with the statement that the applicant was unbelievable because she was speaking without emotion. And so, the fact that he believed these inconsistencies rose high enough to be part of the heart of the claim may have been predicated on the fact that he believed that she was simply untruthful in her entirety based on this... What do you do with all cases that say that one, even if you have factors that the IGL relied on that are not supported by the record, if there's one or more, but at least one that is supported, then we must support it. We have a case law that says that. Now, in every case, you could say, well, you know, there are several factors. One factor will taint the others, and you can't really sort of remove one factor. But our cases say the opposite. Our cases say, look, if you find a single inconsistency that is supported by the record, or one single basis, cogent reason that the IJ gives is supported by the record, that's it. We have to defer. What do you do with those cases? Well, I think those are distinguishable on the fact that the IJ has made a specific delineated finding where he has said independent of this finding with respect to demeanor or this finding with respect to one inconsistency that might fail, this other inconsistency also goes to the heart of the claim and, therefore, should be upheld on that basis. And if it's not explicit in the record, it certainly can be inferred by the record. In this case, it's altogether unclear that that is what the judge was indicating in broad strokes. I'm sorry. You read our cases as saying that the IJ must say each of these are independent reasons that I rely on, either IJ or I rely on independently. There's no case that says that. Not explicitly, Your Honor. Oh, even implicit. No case references that. I mean, do we have any case that says the IJ must indicate that the reason that is upheld would independently sustain the finding? Well, I think in this particular case, the judge broadly, and it's unclear, Your Honor. It really is unclear exactly. I mean, I think it's unclear as to what led to his conclusions with respect to one factor or another, and I don't think it needs to be explicitly stated on the record. What I do know is that in making his adverse credibility determination, he said, I base this conclusion on my observation of her demeanor as she testified, as well as the inconsistencies between her written application for asylum and her oral testimony in court. He went on to say that he didn't believe these inconsistencies went to the heart of the claim, but when he actually touched upon the only inconsistency, which he specifically said did not go to the heart of the claim, was regarding speeches in front of a crowd, which it was stated in the application that the applicant had made, and when she testified, it was clear that she had not made those. She corrected the record. She said there was a mistranslation. She had not made those speeches, and with that, the judge, it should be noted, even in his own opinion, recognized what her claim properly was. It wasn't a leadership role within the organization. It wasn't making speeches in front of the organization. It was, as he even said in his findings, that it was simply her activities within the women's union. On page 10. You have about two minutes left here. Do you want to save that? Yes, let me save that, Your Honor. Thank you. While we hear from the government. Court, please. I'm Marshal Tamar Golding, representing respondent in this case. The adverse credibility determination in this case was based on two things. One, it was based upon the demeanor finding, and second, it was based upon many independent contradictions between what she said in her application and what she testified to. The demeanor finding is pretty weak. You will agree with that, won't you? I suppose any demeanor finding would be weak, Your Honor. Demeanor by its very nature. Well, I wasn't trying to make a moral judgment here. I was really speaking under a case law. We have lots of cases that say that we can sort of presume how much emotion or how much affect witnesses will show in testifying, particularly when dealing with witnesses coming from a different culture. You know, when they look at you, you know, some cultures witnesses will look straight in the eyes, and I guess in the United States that's a sign of truthfulness, whereas in some cultures you look down because looking straight in somebody's eyes reveals a sign of disrespect. So we have cases that deal with that. I mean, that strikes me as pretty weak. I haven't run across that, but I don't want to spend too much time on demeanor, but let me make this one comment, which is the leading case on demeanor in this circuit at least was Penasquito's Village, which has been cited at least twice by Paradis and by Mendoza. I'm sorry, which case? It's Penasquito's Village versus NLRB, 5565 Fed Second. Versus the NLRB? Yeah. 565 Fed Second, 1074. It's not an immigration case, I take it, then. That is correct, but it's been cited. What it said was the following, that all aspects of the witness's demeanor, including expression, how he sits or stands, whether he's inordinately nervous, his coloration, the modulation and pace of his voice, can be considered. Now this has been cited in two immigration cases. Paradis, I'm going to stick with just Paradis there, and Mendoza, Paradis is 36 Fed Third at 818, and Mendoza, 329 Fed Third. Paradis or Estorado, huh? Yes. Let me just kind of cut to the chase. Let's assume that the credibility finding with respect to demeanor is not appropriate. The immigration judge made a number of other findings regarding inconsistencies. Would you address how those would stand up without the demeanor finding and whether any of those go to the heart of the matter? Well, I would say at least the one clearly goes to the heart of the matter, and that's when her whole application was, I am a leader, I gave speeches. Then comes out in court, oh no, I didn't give speeches, and she really didn't explain why. She said, well, there must have been a mistranslation. There's no evidence or anything else of a mistranslation. But I would say there was two others which fairly well go to the heart of the claim, and that is whether the two times or at least two of the times that she says that she was imprisoned or was taken into custody. At one point she says overnight. At another point she says four hours. Now, maybe she could be mistaken as to the number of hours, but there's a clear difference between being held overnight and being held for three or four hours. And the second was six hours is against three days. Now, I would say that does not go to the heart of the claim. I'm not quite sure what does. But I would like to get that down more basically here, which is in terms of what an adverse credibility determination is. A credibility determination merely looks to whether what the witness, or in this case the applicant who is a witness, says occurred is to determine whether it in fact occurred and occurred in the manner in which he says that it did. Now, he has the clear burden of proof on this. This court has said so twice. But it is clear anyway that the person making the case has the burden of proof. Well, the Supreme Court said it too. Yeah. But now the point is, therefore, an adverse, two things follow from this. An adverse credibility determination is not necessarily a finding that this did not happen. It is simply a finding that he did not carry, and because he has a burden, that he did not carry his burden of showing that it did happen, of convincing the fact finder that it did happen. And applying the Elias test, which has been now legislatively adopted, that no reasonable fact finder can fail to find that the applicant made his case. Therefore, if there is anything that a reasonable fact finder, that could reasonably sustain the negative determination, then the determination must be upheld. So what I'm suggesting here is this, that all of these things, including the demeanor, since he has the burden, and therefore, what he has to show, having lost down below, what he has to show in court here is that his indices of truthfulness, of what he said, were so compelling that no one could disbelieve him. And I would suggest that all of these things, including demeanor, would say that he didn't carry that burden. Okay, thank you. We have another part of two minutes for Butler. Regarding the inconsistencies, even if they were not colored by the demeanor finding, they fail on their own. Inconsistency is an inconsistency. If she says X at one point and Y at another point, that's an inconsistency. I don't see how that's colored by the demeanor finding. I mean, either it is an inconsistency or it isn't. Well, Your Honor, I think that in terms of the fact, I think there are always inconsistencies between testimony and a statement. And the fact that the judge thought these rose to the level of the heart of the claim was colored by the fact that he, because of his demeanor determination, that he just didn't solely think that she was believable because she wasn't emitting any emotion. But even if these inconsistencies can, in theory, be independently upheld, they fail. In a broad sense, they all weakened her asylum claim. She did not know what was in that application. She made it clear that there was a mistranslation. Every time that there was an inconsistency, except for the three days. She was represented, right? At the hearing? At the hearing, she was represented. And did the IJ go through the normal driller saying, have you looked at the application and do you stand by it? He said, have you looked at the application? Has it been read back to you in the language you understand? She did say yes. This was at the hearing when she's represented by counsel. She says, I have read. So at point in time one, which would have been about a year or more earlier, she fills out the application. And was she represented by counsel then? No. She was not. She had a third party prepare the application for her, which she then signed. She signed and submitted. And by the time of the hearing, she's represented by counsel. Presumably counsel had a copy of the application or had a chance to look at it before the hearing. And she gets asked by the IJ and gets put under oath and is asked to swear a second time to the truthfulness. She swears under oath the first time when she signs it. And then in open court, after she's been asked, has she had a chance to look at the application, she raises her hand and swears once again, yes, everything I said in there is true. Then a few minutes later, she gets on the stand and says things that are inconsistent with it. I have a hard time saying that, gee, it's really irrational for the IJ to say there really is an inconsistency there. I don't think there's any doubt that there were inconsistencies there. No, no. She says, oh, well, there was an inconsistency because I didn't understand and it wasn't translated to me or anything else. The IJ doesn't believe it because right there in court she has been given a chance to say, no, I haven't looked at it, I didn't understand what it said, it hasn't been read back to me. She says, no, I've read it, I've looked at it, I stand by it, I swear. I raise my hand and swear under oath on the penalty of perjury that everything I said then is something I understand is in fact true. Well, I think there's three kind of stages in this process. One is when she was working with the preparer to make the application, the translation problems could have cropped up in putting a pen to paper, and as you could see by the application, it's essentially one long sentence of capital letters and in fragments it places.  And then I'm assuming now when she reviewed the application with counsel, it was translated back from English into her native tongue in order to determine whether this effectively conveyed her thoughts. And we don't know how, considering the lack of skills at times of the translators in the immigration courts, much less the asylum-preparing notarios, how good that translation back to her verbally was. And then in court, whether or not the translator understood or she understood when the translator said the rote mechanics, when the judge is asking you, you know, have you read this, do you stand by it, of course she's going to say yes, and regardless, I don't know if she really understood. I don't understand why she would say yes. I mean, I've seen petitioners say no. I made a mistake. Things were translated wrong. I didn't have a lawyer. I want to correct and give an explanation right there. I've seen it happen. It happens all the time where they will say, you know, this was inadequate, and I do not stand by it. Let me tell you where it differs. Let me offer corrections now. Now, you know, it could still be held against her at that point, but at least she has a good explanation. She says, look, I didn't have a lawyer. I was prepared without a lawyer. Now I have a lawyer. It's been translated to me. It turns out what was said in there isn't, you know, isn't what I meant, and let me say right now that I don't stand by it, and here are the ways in which I am changing it, and let me tell you the reasons why I'm changing it. It was, you know, bad translator. But she doesn't do that. I mean, she stands there with a lawyer and raises her hand and says, I swear that everything I said then, everything that's in that piece of paper is true. Well, the judge didn't base his rejection. He didn't even mention the fact that she had said there was a mistranslation, which he does say, specifically in regards to the speech. I'm sorry. When did she say this? She said this. When he asked her, do you stand by your? Well, in the course of the testimony. No, no. I'm saying before that, when he asked her. At the hearing, he says, you've had a chance to review your application. Do you stand by it? And does she say, no, there's a bad translation? She doesn't say that. She raises her hand and swears. I mean, this is how it happens. This is the procedure. You're well familiar with it. It would be quite different if she had said at that point, no, no, I've read the translation. I'm horrified. They didn't say anything like what I, you know, what's in there. She doesn't say that. You're correct. She doesn't say that. And when she gets the opportunity later, when she finally understands what it is that apparently was in the application, she says, you know, she collects that. Either that or she's testifying and she gets caught on a lie. And she doesn't, you know, just like people who don't tell the truth, she has trouble remembering what exactly was the lie. And so she gets tangled up. That's another way of looking at it. It would be far more plausible for her to say, look, I've read the application, and it's not what I said. Anyway, your time is up. Thank you, Your Honor. Thank you. Cases are, you will stand submitted. This is one of the cases under the pro bono program, isn't it? Yes. So on behalf of the court, thank you for your participation in the pro bono program. It makes it much easier for, I think, all counsel and for the court. I appreciate it, Your Honor. Indeed. Thank you. Cases are, you will stand submitted. We'll next hear arguments in Holter v. City of Pasadena. I guess counsel didn't have far to travel this morning, huh?
judges: Kozinski, Tashima, McKeown